# Supreme Court of Texas

═══════

No. 20-0811

═══════

University of Texas at Austin President Jay Hartzell, et al.,

*Petitioners,*

v.

S.O.,

*Respondent*

════════════

On Petition for Review from the
Court of Appeals for the Third District of Texas

════════════

*~ consolidated for oral argument with ~*

═══════

No. 20-0812

═══════

Texas State University President Denise M. Trauth, et al.,

*Petitioners,*

v.

K.E.,

*Respondent*

════════════

On Petition for Review from the
Court of Appeals for the Third District of Texas

════════════

JUSTICE BLACKLOCK, joined by JUSTICE DEVINE, dissenting.

According to a diploma on the wall in my office, "The University of Texas at Austin has conferred on [me] the degree of Bachelor of Arts . . . and all the rights and privileges thereto appertaining."  My diploma certifies a historical fact:  My degree was "issued by the Board of Regents upon recommendation of the faculty," and it was "awarded on this eighteenth day of May, 2002."  Like millions of other Texans, my college degree made possible most of what I have since done in my professional life.  I can hardly begin to calculate its value.

This precious asset was "conferred on" me and "awarded" to me on a particular date, in exchange for my completion of the University's requirements and, of course, my payment of tuition.  By memorializing that the University has "conferred" the degree on me and "awarded" the degree to me, my diploma demonstrates something very simple—and I would have thought unremarkable—about the nature of my degree:  It is mine.  It belongs to me, not to the University, and like other valuable assets in my possession, it cannot unilaterally be taken from me by those who later decide I never should have had it.  Our Constitution establishes courts, not universities, to adjudicate disputes about ownership and possession of property.

Many will be surprised to learn from the Court's decision that they hold their college degrees not permanently, as their own property, but contingently, only so long as their alma maters continue to believe they should have received them.  I would have thought that after I graduated and left the University of Texas, the school retained no authority whatsoever over me or my property.  I can find no such power

2

over the rights of graduates mentioned in the voluminous Texas statutes governing universities. Universities certainly have abundant statutory authority to manage their own *internal* affairs, but they have no power to manage the affairs of their graduates. If the Legislature wanted state universities to possess the extraordinary power to unilaterally adjudicate the rights of graduates, surely it would say so. It has not.

The power to decide whether a holder of property must return it to the grantor is quintessentially a judicial power. Universities are not judicial agencies. Modern universities routinely set up internal tribunals that mimic some of the trappings of courts, with varying degrees of fidelity, but these proceedings can impact only the rights of people subject to the university's internal jurisdiction—such as students, faculty, and staff. These mock trials are a way for universities to provide a semblance of due process as part of their executive-branch management of the university's internal affairs. Adjudicating the legal rights of people in the outside world is an entirely different matter. Nothing in Texas law confers such a power on state universities.

The Court suggests that overwhelming precedent from other states favors its conclusion that revoking degrees held by graduates is a necessary part of the internal management of a university. It is true that several such cases exist, but the foundation of all of them is a 1986 Ohio case that does not engage deeply with the nature of college degrees or the character of a graduate's property right in a degree. *Waliga v. Bd. of Trs. of Kent State Univ.*, 488 N.E.2d 850 (Ohio 1986). The Ohio case, in turn, relies on an English case from the year 1723. *King v. Cambridge Univ. (Bentley's Case)* (1723) 92 Eng. Rep. 818; 2 Ld. Raym.

3

1334; 8 Mod. Rep. (Select Cases) 148. In truth, the Ohio case relies on one sentence—plucked out of context—from the English case. As demonstrated below, *Bentley's Case* from the King's Bench has much to teach us about the nature of university degrees under the common law and about the traditional processes by which degrees could be revoked. But the lessons of *Bentley's Case* undermine, rather than support, the Court's conclusion that a modern university's power of self-governance includes the unilateral authority to revoke the degrees of its graduates.

The only resource in Texas legal history bearing on the question presented is a 1969 Attorney General Opinion, with which I largely agree. Tex. Att'y Gen. Op. No. M-466 (1969). The Attorney General Opinion concludes that a state university wishing to rescind a graduate's degree must do what any other regretful grantor of property must do to rescind the grant. It must ask a court to require the property's return. That is correct. A party seeking rescission of someone else's property is quite obviously not managing its own internal affairs. It is seeking to manage the affairs of the party resisting its claims, and for this it typically needs the judicial power of a court. Nor is it exercising a power that flows naturally from the power to confer the property in the first place. The power to bestow something of value on another normally does not entail the power to unilaterally take it back. This kind of "self-help" remedy is rarely found in the law. It is so rare that I would expect it to be stated clearly in the governing statutes if the Legislature indeed gave it to universities.

Whether the separation of powers would permit the Legislature to bestow the essentially judicial function of degree revocation on a

4

university is itself an interesting question. The only question before the Court, however, is whether the Texas Legislature has done so. I see nothing in the governing statutes that would authorize a state university to unilaterally determine the legal rights of graduates who have no ongoing affiliation with the school. I therefore respectfully dissent.

## I.

The parties do not engage deeply with two questions I find essential to a proper understanding of these cases. First, what is a college degree? And second, what does it mean to revoke one? All involved seem to agree that a degree is, at least in some limited sense, the property of the degree holder. The parties offer little argument about the nature of the thing over which they are fighting. Both the universities and the Court acknowledge that a degree is in some ways property, to which some unspecified degree of due-process protection attaches. *Ante* at 17 n.11, 28 n.20. But elsewhere, the Court says that a degree is merely the "university's certification to the world at large of the recipient's educational achievement and fulfillment of the institution's standards." *Ante* at 21 (quoting *Waliga*, 488 N.E.2d at 852). If a degree is merely the "university's certification to the world"— essentially the university's speech rather than the graduate's property—then I would agree that whether the degree persists is a question within the university's control. After all, it is up to the university to decide what it will certify and what it will not certify.

I cannot join this line of reasoning, however, because I doubt that a degree is merely the "university's certification to the world at large of

5

the recipient's educational achievement and fulfillment of the institution's standards." This strikes me as an apt definition of a *diploma*, but it does not adequately capture the nature of the intangible asset that the diploma says now belongs to the graduate—the degree itself. My diploma certifies to the world that I have fulfilled the institution's standards. It further certifies that, because I have done so, I now possess a degree. While the diploma is the University's certification that I have earned the degree, the degree itself is much more. As I see it, the degree is intangible property held by the graduate as the fruit of a bilateral transaction with the university. After the degree is conferred, the transaction has been consummated and the property has changed hands. Graduates then possess their degrees as a species of property, in a way that they could never possess the university's ongoing "certification."

But even if we think of a degree as a "continuing certification regarding the recipient's fulfillment of the university's requirements," as the Court does, *ante* at 21, it is at most a continuing certification that the recipient was *found* to have fulfilled the requirements *at the appointed time*. As my diploma reflects, the University certified that, on the recommendation of the faculty, a degree was conferred on me on a particular date. That will always be true. The faculty may later come to regret their recommendation, and the University may later decide my degree was awarded in error, but that does not change the truth of the certification stated on my diploma.

In any event, it is my diploma—not my degree—that "certifies" my fulfillment of the University's requirements. I see no basis—other

6

than *ipse dixit* from foreign jurisdictions—for the Court's view that a college degree is, at bottom, merely a continuing certification by the university that the degree *should have* been awarded. Adopting such an impoverished understanding of the nature of these degrees—these precious credentials for which we pay so much and work so hard—allows the Court to reach the conclusion it reaches. But this paltry conception of a degree is plainly insufficient. My diploma tells me that my degree is much more than the University's certification that I fulfilled its requirements. As my diploma certifies, I now possess something of value—a degree, to which "rights and privileges" appertain, which has been "conferred on" me and "awarded" to me. The degree and the certification of its having been conferred are two different things. My degree is intangible, but it is something of great value that now belongs to me, quite apart from the diploma's certification of the fact of its conferral.[1]

That is what I take a degree to be. But then what does it mean to revoke a degree?[2] The parties do not say, but I take it to mean the

---

[1] *Accord Bentley's Case*, 92 Eng. Rep. at 819 (concluding that a degree is "a dignity and a freehold"); *infra* at 18–19.

[2] The concurrence would hold that what is really at stake here is not whether a university actually has the authority to revoke degrees, but whether these universities have the authority to take the particular administrative actions they took when attempting to do so: (1) placing a notation on a transcript that the degree has been revoked, (2) requesting that the plaintiffs no longer represent that they hold a degree, and (3) requesting that the plaintiffs return their diplomas. *See ante* at 2 (Boyd, J., concurring). But the plaintiffs do not argue that the universities lacked the power to take these predicate administrative actions designed to accomplish revocation of a degree, such as letter-writing or transcript-notation. Instead, the argument is that the

following. To revoke a degree would be to make this statement by the graduate false: "I have a degree from X University." Assume the statement is true unless the degree is revoked. If the degree is revoked—in a way that is legally binding on the graduate—then the statement becomes false. This is not an abstract matter. The ability to state truthfully that "I have a degree from X University" is a very important thing, for which people pay many thousands of dollars and devote years of time and effort. If the statement is rendered false by the legally binding revocation of my degree, then if I continue to say it, I am misleading others and perhaps liable for fraud. If, on the other hand, a university without the authority to revoke my degree merely claims to have done so, the statement is not rendered false. If the university lacks

_____

universities lack the power to revoke degrees at all, so there is no administrative action that would accomplish revocation. By analogy, a plaintiff challenging a state agency's administrative action might argue that the agency (1) lacks authority to do the substantive thing its administrative action claims to be doing or (2) lacks authority to take the procedural steps it used to carry out its action. Either would be a valid line of attack, but the claims in this case fit comfortably within the first category. The issue here is not *how* the universities communicate or memorialize their decisions to revoke a degree. The issue is whether the universities have the *power* to revoke degrees at all. The parties' arguments bear this out. *See, e.g.*, 20-0811, Petitioner's Brief on the Merits, at 6 ("The power to revoke an improperly conferred degree likewise fits comfortably within Defendants' academic authority."); 20-0811, Respondent's Brief on the Merits, at 43 ("[T]he Court must affirm that portion of the trial court's judgment declaring that UT Officials lack express and implied authority to revoke a degree."); 20-0812, Petitioner's Brief on the Merits, at 5 ("The power to revoke an improperly conferred degree likewise fits comfortably within the TXST Defendants' academic authority."); *and* 20-0812, Respondent's Brief on the Merits, at 1 ("The central question in this case is whether the Legislature has granted Texas State University any authority over a former student, namely the power to revoke a former student's previously conferred degree.").

8

the power to revoke degrees, then I may continue to say I have a degree without misleading others, irrespective of the university's position on the matter.[3]

## II.

With these preliminary questions addressed, I turn to the statutory question presented. The Court finds two places in statute that it believes confer on state universities the power to revoke degrees. The first is the statutory power to *grant* degrees. The second is the universities' general power to manage their internal affairs. Neither supports the authority the Court grants the universities today.

The universities have explicit statutory authority to award degrees. TEX. EDUC. CODE § 65.31(b) (University of Texas); *id.* § 95.24 (Texas State University). Once a degree is awarded, however, does the graduate's possession of the degree remain subject to the universities' oversight? The statutes are silent. Authority to revoke degrees might exist by implication, despite the statutes' silence, but only if the implied

---

[3] I do not doubt that state universities have authority to conduct internal investigations into past student conduct and to come to their own conclusions, which are not binding on graduates, about whether previously awarded degrees should have been awarded. This clearly falls within their internal powers of "operation, control, and management [over] the university system." *E.g.*, TEX. EDUC. CODE § 65.31(c). Likewise, a university's powers of internal management would include the power to add a notation to a student's file or transcript—documents within the university's control—indicating a finding of fraud or deceit in the achievement of the degree. Whether a graduate who is the subject of such a finding by a university has recourse to challenge it in court is not a question raised by the cases before this Court. These cases ask only whether state universities have statutory authority to unilaterally revoke the degree itself, which I take to mean the authority to render the graduate a liar if the graduate continues to say "I have a degree" after a university deems the degree revoked.

power to revoke a degree is "reasonably necessary to carry out" the express power to confer degrees. *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 33 (Tex. 2017).

Surely it is not. The absence of degree-revocation power has no effect on the power to confer degrees. A university is perfectly capable of examining current students, determining their eligibility for graduation, and conferring degrees accordingly without the ability to, afterwards, exercise unilateral control over the graduate's continued possession of the degree. As observed above, in most instances the power to confer something of value on another decidedly does *not* carry with it the power to unilaterally dispossess the grantee. One who confers something of value on another does not normally retain the right to act as judge, jury, and executioner in a later dispute about whether the transaction was procured by fraud. When it comes to the transfer of property, the power to grant property and the power to revoke it are more like opposite poles than they are like fellow travelers. It is possible for both powers to belong to one party, but it is in no sense *necessary*— or even likely—that they do.

The Court also finds degree-revocation authority implied within the universities' broad statutory authority to manage their internal affairs. For example, Texas State University is "responsible for the general control and management of the universities in [its] system." TEX. EDUC. CODE § 95.21(a). It may "perform such other acts as in the judgment of the board contribute to the development of the universities in the system or the welfare of their students." *Id.* And its board of trustees has the authority to promulgate rules "for the operation,

10

control, and management of the university system and its institutions as the board may deem either necessary or desirable." *Id.* § 95.21(b).

The University of Texas has similarly broad authority. It may "promulgate and enforce such other rules and regulations for the operation, control, and management of the university system and the component institutions thereof as the board may deem either necessary or desirable." *Id.* § 65.31(c). It may also "prescribe the number of students that shall be admitted to any course, department, school, college, degree-program, or institution under its governance." *Id.* The governing boards of both schools may "exercise the traditional and time-honored role for such boards as their role has evolved in the United States." *Id.* § 51.352(a). They are further empowered to "enhance the public image of each institution under [their] governance," *id.* § 51.352(a)(2), and "strive for intellectual excellence," *id.* § 51.354(6).

These statutes certainly convey abundant *internal* governing authority. But the moment a university seeks to employ this inward-facing authority to prejudice the legal rights of people outside its internal jurisdiction, our judicial hackles should rise. The power to "control" and "manage" the affairs of a university cannot include the power to control and manage the affairs—or the legal rights—of people or entities outside of the university.

The Court, however, relies heavily on the broadly stated statutory powers vested in the universities, such as the power to "perform such other acts as in the judgment of the board contribute to the development of the universities," to "enhance the public image of each institution," and to promote "the welfare of students." On their face, these powers

11

bestow vast authority on universities to do all kinds of things regardless of the legal rights of outsiders. But within their context (and in order to be constitutional), these broad grants of authority must carry with them an implied limitation: A university cannot unilaterally adjudicate the legal rights of those outside its internal jurisdiction merely because doing so would "contribute to the development of the university" or "enhance the public image" of the institution. The broad power to act for the university's benefit is, and must be, purely inward facing, purely about matters internal to the university that do not prejudice the legal rights of those in the outside world.

The Court reasons that a university's power of internal management must include the authority to investigate and act upon allegations of academic misconduct. I agree. The Court's mistake, as I see it, is to downplay the difference between expelling a current student for academic misconduct and revoking the degree of a former student for academic misconduct. The Court says the difference should not matter because it is merely "one of timing." *Ante* at 20.[4] Of course, differences of timing—such as statutes of limitation—often make all the difference when the question is how allegations of past wrongdoing may be adjudicated.

---

[4] The Court struggles to locate a "point of no return," after which a university may not unilaterally revoke the degree of a former student for conduct that would bar a current student from obtaining a degree. *Ante* at 21. The obvious answer is the date on the diploma. A degree was conferred on the graduate—and thereafter belonged to him as a private citizen outside of the university's jurisdiction—as of that date.

More fundamentally, the difference is not merely one of timing. It is one of power, of jurisdiction. To use familiar judicial parlance, I agree with the Court that a university has *subject-matter jurisdiction* over allegations of academic misconduct. But unlike the Court, I would hold that a university lacks *personal jurisdiction* over its graduates, who take their persons and their legal rights—including their degrees—into an outside world that is entirely beyond the university's reach.

Courts must possess both elements of jurisdiction in order to issue judgments binding on the parties. The same rule should apply here, particularly because the power the universities seek is in many ways judicial. We ought to be very reluctant to adopt any reading of a statute that gives universities jurisdiction to adjudicate the legal rights of people outside the university. The default rule should be that graduates living in the outside world are not subject in any way to the internal-governance powers of their alma maters, and only a clear legislative statement to the contrary should be permitted to change this fundamental limitation on a university's authority, subject to the Constitution. No such legislative statement exists here, and I would not imply one as the Court does. Whether a graduate will continue to possess his degree is no mere question of internal university governance. It is a question of property rights existing in the world outside the university, and Texas law gives state university administrators no authority to decide such questions.[5]

---

[5] The Court suggests that while state universities have the power to revoke their graduates' degrees, they cannot do so for conduct occurring after graduation. *Ante* at 19. I like this rule, although I fail to see how the rest of

**III.**

For further insight, I turn to the same place the Court does—judicial precedent. None of the American cases cited by the universities and the Court pre-date the 1986 Ohio Supreme Court case of *Waliga v. Board of Trustees of Kent State University*. 1986 seems a strange starting point for judicial analysis of the "traditional and time-honored role" of the governing boards of universities. TEX. EDUC. CODE § 51.352(a). In any event, nearly all the American cases rely on *Waliga*, which itself offers little thoughtful analysis of the nature of the property interest entailed by a university degree or the legal relationship (or lack thereof) between graduates and their alma maters.

---

the Court's opinion supports it. And even if the offending conduct must have taken place while the graduate was a student, no principle arising from the Court's decision would limit the degree-revocation power to cases of academic fraud. Today's universities enforce elaborate codes of conduct on threat of suspension or expulsion, and it is no startling revelation to observe the unwelcome reality that they often do so in a heated political and ideological environment. The University of Texas labels a number of actions as sanctionable misconduct, including violations of law, unauthorized possession of weapons, use of hazardous substances, theft, hazing, drug use, harassment, stalking, gambling, disruptive or violent conduct, animal cruelty, and retaliation. UNIV. OF TEX. INST'L. RULES ON STUDENT SERVS. AND ACTIVITIES § 11–401(a). Could a degree be revoked if the University later determines a graduate committed one of these acts while a student and therefore should have been denied a degree? Under the Court's decision, the answer seems to be yes. Furthermore, what about private universities? If the validity of a graduate's degree is a matter of internal university governance and rescindable by administrative decree—rather than a property right rescindable by judicial process—then private universities, whose powers are neither defined by statute nor limited by the First Amendment, may be at liberty to rescind their graduates' degrees for any reason at all, including ideological whim.

14

The *Waliga* court, in turn, bases its analysis on a misreading of the only pre-1986 case cited to this Court, a 1723 English case about degree revocation at Cambridge called *Bentley's Case*, which appears to be the leading common law case on the subject.[6]  Other courts on which the Court relies have followed suit.  *E.g.*, *Crook v. Baker*, 813 F.2d 88, 93 (6th Cir. 1987).

*Waliga* focuses narrowly on one line from *Bentley's Case*, which says Cambridge could "revoke a degree for 'a reasonable cause.'"  488 N.E.2d at 852 (quoting *Bentley's Case*, 88 Eng. Rep. at 119).  *Waliga* otherwise construes *Bentley's Case* to require only that a university provide a degree holder with sufficient due process while revoking a degree.  In reality, the lessons of *Bentley's Case* are considerably more complex and, when properly understood, stand at odds with the outcome reached by American courts 250 years later.

Before delving into *Bentley's Case*, it is worth asking why we would bother analyzing a 1723 English case in a modern statutory-interpretation dispute.  The answer is simple.  The Legislature has provided that the powers of our state's universities are to be understood in light of a university's "traditional and time-honored role."  TEX. EDUC. CODE § 51.352(a).  As the only resource pre-dating

---

[6] Reporting on *Bentley's Case* appears in at least three separate records in the English Reports: first at 88 Eng. Rep. 111; again at 92 Eng. Rep. 370; and finally at 92 Eng. Rep. 818.  This is in part because the case was argued to the King's Bench at least twice.  *See Bentley's Case*, 92 Eng. Rep. at 373.  Throughout this opinion, the volume of the English Reports cited is adjusted to reflect which record of the case is being cited.  Like the Gospels, each report of *Bentley's Case* adds detail the others lack, but all of them tell a consistent story.

15

1986 to which the Court is directed on the question of a university's time-honored role—and as the foundational authority for all the modern American cases on the subject—*Bentley's Case* plays an unusually important role here for a case of its vintage. Moreover, I cannot find a single decision from this Court's history that sheds light on either the nature of a college degree or on a public university's authority to revoke one. Given the influential role *Bentley's Case* has played in the development of the American precedent on the topic and the absence of any other persuasive authority, a proper understanding of *Bentley's Case* seems not just helpful but required.[7]

The University of Cambridge traces its founding to 1209 A.D. From Henry III to Elizabeth I, the English Crown chartered Cambridge as a corporation, provided legal protections for its teachers and students, and augmented Cambridge's legal status above that of a normal corporation by charging it with certain functions usually reserved for government.[8] As the power of Parliament grew relative to the Crown,

---

[7] An additional reason to consult *Bentley's Case* is that it is part of the "common law of England," which was adopted into Texas law as soon as our state achieved independence from Mexico and remains part of our state's law today. *See* Repub. of Tex. Const. of 1836, art. IV, § 13 ("The Congress shall, as early as practicable, introduce, by statute, the common law of England, with such modifications as our circumstances, in their judgment, may require."); *see also* TEX. CIV. PRAC. & REM. CODE § 5.001(a) ("The rule of decision in this state consists of those portions of the common law of England that are not inconsistent with the constitution or the laws of this state, the constitution of this state, and the laws of this state.").

[8] *E.g.*, Charter of 20 Edward I Confirming the Privileges of the University of Cambridge (Feb. 6, 1291/92) (Latin language document), available at https://cudl.lib.cam.ac.uk/view/MS-UA-LUARD-00007-AST/1 (last visited March 29, 2023).

the legal efficacy of the royal charters came under doubt. So, in 1571, Parliament officially incorporated both Cambridge and Oxford, reaffirming the traditional legal protections and privileges previously guaranteed by royal charter. *See* An Act for Incorporation of Both Universities 1571, 13 Eliz. c. 29 (Eng.).[9]

One privilege bestowed by law on Cambridge was the right to exercise judicial power within prescribed jurisdictional limits. By the time *Bentley's Case* was argued before the King's Bench in 1723, Cambridge had long held the authority—conferred explicitly by Act of Parliament—to operate a court. 3 WILLIAM BLACKSTONE, COMMENTARIES *83. The University's chancellor or vice-chancellor sat as its judge. *Bentley's Case*, 92 Eng. Rep. at 818.[10] The court at Cambridge enjoyed "sole jurisdiction, in exclusion of the king's courts, over all civil actions and suits whatsoever, when a scholar or privileged person [was] one of the parties." 3 WILLIAM BLACKSTONE, COMMENTARIES *83–84. Despite the court's apparently wide

---

[9] *See also* 4 EDWARD COKE, THE INSTITUTES OF THE LAWS OF ENGLAND 227 (1644) ("[T]o the intent that the ancient privileges, liberties, and franchises [of Cambridge] . . . might be had in greater estimation, and be of greater force and strength . . . it was enacted by authority of Parliament 1. That each of the universities should be incorporated . . . 2. That all letters patent . . . should be good and effectual [and] 3. That the chancellor, masters, and scholars . . . should several have . . . all manner of liberties . . . and privileges, which [Cambridge] had held, occupied, or enjoyed . . . according to the true intent and meaning of the said letters patent.").

[10] To this day, Cambridge's own recounting of its history notes that the university maintained a court over which its university administrators acted as judge. *See* UNIV. OF CAMBRIDGE, *About the University: Moves to Independence*, https://www.cam.ac.uk/about-the-university/history/moves-to-independence (last visited March 27, 2023).

subject-matter jurisdiction, its authority appears to have been constrained by two important limiting principles. First, one of personal jurisdiction: "the party proceeded against must in general be a resident member of the university." *Id.* at \*83 n.9. Second, a geographical limitation: the cause of action must have accrued "within the town [of Cambridge] and its suburbs." *Id.*

The Cambridge court was, in every relevant sense, exercising judicial power as we conceive of it today. Though Blackstone labelled it a "private court," such tribunals only bore that label because their jurisdiction was "private and special, confined to particular spots, or instituted only to redress particular injuries." *Id.* at \*71. Subject to the limitations described above, Cambridge's courts were otherwise able to exercise the usual powers of a court of that time.

*Bentley's Case* proceeded as follows. An action was initiated in the Cambridge court of the vice-chancellor to revoke Bentley's degree for non-payment of debt. Bentley—then a resident scholar at Cambridge and a head of one of its academic departments—was issued a summons, which he ignored. Evidence was collected through affidavits and depositions. After Bentley repeatedly refused to submit to the Cambridge court's jurisdiction, a default judgment was issued against him on the debt charge, and Cambridge revoked his degrees. The King's Bench later granted Bentley's mandamus petition in what we call *Bentley's Case*, which had the effect of restoring his degrees, but only on procedural grounds. 92 Eng. Rep. at 820.

*Bentley's Case* bears on the matter at hand in at least three important ways. First, the King's Bench treated Bentley's degree as "a

18

freehold and a dignity"—in other words, a species of property belonging to Bentley, which could not be taken from him without judicial process. *Id.* at 819. Today, the word "freehold" still connotes ownership and control of property, similar to how it was understood in 1723.[11] But the word "dignity" conveyed more in those days than it might to the modern eye. Blackstone defined a "dignity" as a kind of property interest, an "incorporeal hereditament" that one could own, not unlike how real and personal property are owned. 2 WILLIAM BLACKSTONE, COMMENTARIES *16–18. An "incorporeal hereditament" was "a right issuing out of a thing corporate (whether real or personal) or concerning, or annexed to, or exercisable within, the same." *Id.* at *20. The judges in *Bentley's Case* were acutely concerned with ensuring that the appropriate *judicial* process had been followed before Bentley was divested of the "freehold" and "dignity" represented by his Cambridge degree. 92 Eng. Rep. at 819.

Second, the only reason Cambridge could revoke Bentley's degree without resort to outside judicial process was that—quite unlike modern state universities—Cambridge had been given specific authority by both the Crown and Parliament to exercise judicial power. In other words, Cambridge was authorized by law to operate a court—not the kind of ad hoc tribunal playing at due process in a modern university, but a real

---

[11] *Compare Freehold*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An estate in land held in fee simple, in fee tail, or for term of life, any real-property interest that is or may become possessory."), *with Freehold*, SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1755) ("That land or tenement which a man holdeth in fee, fee-tail, or for term of life. Freehold in deed is the real possession of lands or tenements in fee, fee-tail, or for life. Freehold in law is the right that a man has to such land or tenements before his entry or seizure.").

court exercising the judicial power of the sovereign to adjudicate the property rights of those, like Bentley, who lived within its jurisdiction. The King's Bench in *Bentley's Case* was not reviewing the internal-governance decisions of administrators hired to manage the university's affairs. It was reviewing the judicial action of an inferior court established by law to neutrally adjudicate disputes over property and other legal rights. Modern universities do not—and cannot—play the judicial role Cambridge played in 1723.

The King's Bench did affirm that Cambridge possessed the judicial power to revoke degrees, but this holding in no way suggests that modern state universities—which lack any statutory authority remotely resembling Cambridge's—possess an implied, "time-honored" power to unilaterally revoke degrees. Instead, the "time-honored" rule reflected by *Bentley's Case* is that revocation of a degree dispossesses the graduate of a valuable property right, which can only be accomplished by a neutral judicial process, not by the unilateral decree of university officials. Indeed, the King's Bench held Cambridge's court to all the standards of due process applicable to common law courts of the time, and this requirement formed the basis for a ruling in Bentley's favor. *Bentley's Case*, 92 Eng. Rep. at 378 ("[P]roceedings in the vice-chancellor's court . . . must be intended to be agreeable to the rules of the common law" and "this Court will relieve him, if he has been proceeded against and degraded, without being heard, which is contrary to natural justice.").

This leads to the third lesson from *Bentley's Case*. The reason Bentley was subject to the jurisdiction of Cambridge's court was not that

20

he held a Cambridge degree.  It was only because he lived within Cambridge's corporate limits as a resident scholar at the University that Bentley—and his degree—were subject to Cambridge's judicial power. *See* 3 WILLIAM BLACKSTONE, COMMENTARIES *83 n.9 ("[T]he party proceeded against must in general be a resident member of the university."). Thus, even assuming (incorrectly) that state universities could exercise judicial power within their own spheres, *Bentley's Case* provides no support for the notion that a university's jurisdiction traditionally extends to graduates with no ongoing connection to the university.  Quite the opposite.  *Bentley's Case* indicates that even a university granted broad judicial power within its boundaries—a power modern state universities lack—did not traditionally have authority to adjudicate the legal rights of graduates in the outside world.

\* \* \*

The point is not just that *Bentley's Case* provides no true support for the Ohio court's decision in *Waliga* or for the later decisions of the American courts that have followed suit.  Instead, the more important point is that *Bentley's Case*—the only "time-honored" authority cited to this Court regarding the "traditional and time-honored role" of universities—affirmatively undermines the foundation of the Court's reasoning.  The Court proceeds as if revocation of a degree is essentially a matter of internal university governance, a kind of internal, educational "disciplinary decision" with which courts should be loath to interfere. *Ante* at 26–27.  *Bentley's Case* is entirely to the contrary.  It teaches that a degree is the graduate's property, that it cannot be taken from its holder without judicial process, and that the power of a

21

university does not extend to those who live and work beyond its borders. We ought to be guided by these time-honored principles, and we ought to interpret modern Texas statutes about the "traditional" power of universities in light of them. Instead, the Court gives the University of Texas in 2023 more power to revoke the degrees of its graduates than the University of Cambridge had in 1723. I must respectfully dissent.

James D. Blacklock
Justice

**OPINION FILED:** March 31, 2023

22